[Cite as *State v. Coleman*, 2026-Ohio-2961.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30697 |
| Appellee | : | |
| | : | Trial Court Case No. 2024 CR 03030 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| OTTO COLEMAN | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 31, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately send a copy of the court's ruling to each party and note that action on the docket. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,

*Christopher B. Epley*

_____
CHRISTOPHER B. EPLEY, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

ROBERT ALAN BRENNER, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee

EPLEY, J.

{¶ 1} Otto Coleman was found guilty of felonious assault (deadly weapon) on a peace officer after a jury trial in the Montgomery County Court of Common Pleas. The trial court imposed an indefinite sentence of ten to fifteen years in prison. Coleman appeals from his conviction, claiming that it was against the manifest weight of the evidence and that his sentence was contrary to R.C. 2929.11. For the following reasons, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} According to the State's evidence at trial, at approximately 8:09 p.m. on August 11, 2024, Dayton Police Officer Ronnie Taylor and his partner, Officer Dylan Lehotay, arrived at 701 North Broadway in Dayton in response to a mental health call. The comments by the caller were confusing. Taylor recalled that the comments described someone inside a camper messing with some wires.

{¶ 3} Upon arriving at the address, a former residence that had been converted to a mosque, Officer Taylor parked on the gravel driveway. Both officers saw a man, later identified as Coleman, pushing a lawn mower across the driveway toward the building. Simultaneously, Coleman saw the officers, abandoned the mower, and slowly jogged around the building. Officer Lehotay headed toward the camper while Taylor followed Coleman toward the back of the premises.

2

{¶ 4} As Taylor approached and entered the fenced backyard, he identified himself as a police officer and explained that they had received a call. Taylor hoped to obtain more information about the basis for the dispatch. At that point, Taylor did not know if Coleman was the caller or the reason for the call. He received no response from Coleman.

{¶ 5} Taylor found Coleman in the narrow space between the fence and a shed that was near the far corner of the back of the house. The officer saw that Coleman was holding a knife and breathing a little heavily. Taylor immediately told Coleman to drop the knife and pointed his firearm at him. Coleman ignored Taylor's repeated commands to drop the knife and charged the officer. As he continued to order Coleman to drop the knife, Taylor backed away, trying to separate himself from Coleman. Coleman continued to sprint at him and raised the knife as if to stab the officer. When Coleman was within an arm's reach of Taylor, Taylor shot him four times. Even after he fell to the ground, Coleman refused to relinquish the knife.

{¶ 6} After the shooting, additional officers responded to the scene. Coleman was repeatedly asked to drop the knife or put it on the ground, but he failed to do so. Officer Joshua Gundaker observed Coleman going in and out of consciousness; when Coleman was conscious, he would swipe out with his knife.

{¶ 7} For officer safety, a plan was developed for a group of officers to approach Coleman in a "wedge formation" behind a ballistic shield. Using this plan, Gundaker was able to pin Coleman with the shield and remove the knife. Taylor testified that Coleman had been ordered to drop the knife approximately 70 times before he was disarmed. Coleman was then handcuffed, and Officers Gundaker and (now Detective) Carla Burch rendered first aid until medics took over and transported him to the hospital.

{¶ 8} On November 15, 2024, Coleman was indicted on felonious assault (deadly weapon) on a peace officer (Officer Taylor) with a repeat violent offender specification, a first-degree felony (Count 1), and resisting arrest, a fourth-degree felony (Count 2).

{¶ 9} Eleven months later, the case proceeded to a jury trial on the charged offenses. The repeat violent offender specification was tried to the bench. The State presented the testimony of seven police officers and numerous exhibits, including Taylor's and Lehotay's body camera videos of the encounter. Coleman testified on his own behalf. With respect to Count 1, the court instructed the jury on both felonious assault and the lesser included offense of assault. After deliberating, the jury found Coleman guilty of felonious assault but not guilty of resisting arrest. The trial court found that Coleman was a repeat violent offender.

{¶ 10} The court ordered a presentence investigation and scheduled the sentencing hearing for November 13, 2025. Prior to disposition, the State filed a sentencing memorandum, advocating for a prison sentence of five to ten years. It emphasized Coleman's fifty-year history of violent offenses, including several against police officers.

{¶ 11} At sentencing, defense counsel acknowledged Coleman's criminal history but asked for leniency due to Coleman's age (79) and health issues. Speaking on his own behalf, Coleman told the court of his medical needs. The State referred the trial court to its sentencing memorandum. After articulating Coleman's criminal history, the trial court told Coleman that "the facts of this case and your criminal history are shocking to me how violent they are," and it described Coleman as a "dangerous, dangerous man." The court continued: "And I got to be honest, age or not age, in considering the purposes and principles of sentencing and the seriousness and recidivism factors in R.C. 2929.11 and R.C. 2929.12 and for all the reasons that I just put on the record, the Court is sentencing you in Count I,

4

felonious assault, to a term of imprisonment of ten to 15 years." It did not impose an additional prison term for the repeat violent offender specification.

{¶ 12} Coleman appeals from his conviction, raising two assignments of error. We address them in reverse order.

## II. Manifest Weight of the Evidence

{¶ 13} In his second assignment of error, Coleman claims that his conviction was against the manifest weight of the evidence. He argues that he did not attempt to harm the officer and that a "bread knife with a rounded tip" is not a deadly weapon.

{¶ 14} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.). When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 15} Coleman was charged with felonious assault on a peace officer in violation of R.C. 2903.11(A)(2). The statute provides that no person shall knowingly "[c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." Of relevance here, "[a] person acts knowingly, regardless of purpose, when the

5

person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 16} A defendant's culpable mental state is often proven with circumstantial evidence. *State v. Dominguez-Olivia*, 2026-Ohio-484, ¶ 25 (2d Dist.). Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991); *State v. St. John*, 2019-Ohio-650, ¶ 49 (2d Dist.). A defendant's state of mind may be inferred from the totality of the circumstances. *State v. Murphy*, 2018-Ohio-3506, ¶ 16 (2d Dist.).

### A. Attempt to Cause Physical Harm

{¶ 17} Coleman first argues that he did not attempt to cause physical harm to Officer Taylor. Taylor testified about his interaction with Coleman, and the encounter was captured by Taylor's body-worn camera. The video showed that after Taylor politely asked Coleman to drop the knife, Coleman ran directly at the officer while holding the knife in a threatening manner. Taylor backed away and gave repeated commands for Coleman to drop the knife, before firing on Coleman. Taylor testified that Coleman's actions made him believe that Coleman was trying to take his life, and he stated that he had used lethal force in response to lethal force, as he had been trained.

{¶ 18} Officer Lehotay heard Taylor give commands to Coleman, saw Taylor unholster his gun, and observed Coleman charge at Taylor. Lehotay substantiated that Taylor began "backpedaling while giving commands and then, ultimately discharged his firearm." Tr. 81-82. Lehotay testified, and his body-worn camera video confirmed, that Coleman came within an arm's length of Taylor. A jury could have reasonably concluded from the officers' testimony and videos that Coleman had attempted to cause physical harm to Taylor.

6

{¶ 19} Testifying in his defense, Coleman explained why he had acted as he did. He stated that he was cutting the grass when the police drove into the driveway. He explained that, while mowing the lawn, he carried a knife that he used to cut flowers. Coleman stated that "there [was] not supposed to be anyone on the property . . . because it was a religious sanctuary." Consequently, when the police arrived, he "walked at a fast pace" to the backyard, "because we were instructed by our leaders to be among people that bring us to the religion" and "we had had difficulty with the police before." Coleman hoped the police would leave.

{¶ 20} Coleman first went into the shed and then stood beside the shed as the police officer followed him into the backyard. While Coleman was standing between the shed and the fence, he saw Officer Taylor take out his gun and heard the officer tell him to drop the knife. When Coleman was asked what he did when the officer told him to drop the knife, he responded that he "used the knife to cut flowers" and that "the knife wasn't for them." He said that he "didn't drop it, because I used the knife to cut flowers with."

{¶ 21} Defense counsel asked Coleman why he had started to run. Coleman explained that he "was moving" because "they instruct us in the military that you can't hit a moving target" (Coleman had served in the Air Force between 1964 and 1968) and "so I wouldn't get fatally shot." Coleman testified that he was not trying to harm Taylor. He denied trying to slash or stab the officer. When Coleman was asked why he did not drop his knife as Taylor continued to yell at him to drop it and even after he had been shot, he repeated, "Because, as I said earlier, I use my knife. My knife is for me to cut flowers with it. It wasn't for them." Coleman believed that the police had asked him to drop the knife because they had "com[e] to the wrong conclusion. They thought it was for them, but it wasn't."

7

{¶ 22} It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Coleman had committed felonious assault against Taylor. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2021-Ohio-3947, ¶ 27 (2d Dist.). On this record, we cannot conclude that the jury lost its way when it ostensibly credited the State's witnesses and found that Coleman had knowingly attempted to cause physical harm to Taylor when he charged at the officer with a knife.

**B. Deadly Weapon**

{¶ 23} Coleman further claims he did not violate R.C. 2903.11(A)(2), because a "bread knife with a rounded tip" is not a deadly weapon. The term "deadly weapon" is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A); *see* R.C. 2903.11(E)(1).

{¶ 24} We have long held that "knives are generally not presumed to be deadly weapons." *State v. Schooler*, 2003-Ohio-6248, ¶ 20 (2d Dist.). For a knife to constitute a deadly weapon for purposes of felonious assault, the State must prove, in accordance with R.C. 2923.11(A), that the knife was capable of inflicting death *and* either (1) had been designed or specially adapted for use as a weapon or (2) possessed, carried, or used as a weapon. "When use is a factor, the manner of its use and the nature of the instrument itself determines its capacity to inflict death." *Schooler* at ¶ 20.

{¶ 25} In this case, defense counsel referred to Coleman's knife (State's Exhibit 20) as a bread knife, and Officer Lehotay agreed with that description. Other officers, however, disagreed. Detective Alec Denker of the Montgomery County Sheriff's Office, who investigated the officer-involved shooting, described Coleman's knife as a "steak knife" with

8

"a plastic handle, an approximately five and a quarter inch serrated blade with a rounded but sharpened tip." Tr. 151. Officer Gundaker similarly described Coleman's knife as a steak knife. Tr. 119.

{¶ 26} Several officers addressed the dangerousness of knives, including the one Coleman wielded. Denker testified that, especially in a close quarters assault, one could expect lacerating or slicing wounds and stabbing wounds. He explained that, with stabbing or slashing assaults, "we see disfigurement, amputations, loss of eyes. We see lacerations that result in exsanguination or – or extreme blood loss, where persons can lose consciousness, lose their lives, lose function of their organs, suffer disfigurement or permanent injury to their – their body, their eyesight, their function." Tr. 143.

{¶ 27} Officer Gundaker testified that he had responded to calls involving knives, and that the injuries could include "mutilation and/or death." Tr. 116. He stated that Coleman's knife was similar to the "mutilation and death knives" he had seen in the past. Officer Taylor likewise told the jury that he had responded to calls involving a knife before and had seen a variety of injuries, including stab wounds to the "stomach, the neck, multiple different areas." Officer Lehotay indicated that the officers' body armor did not protect their neck, face, eyes, and arms and that Coleman's knife could have cut those areas.

{¶ 28} The jury saw the knife with which Coleman had threatened Taylor, and regardless of the label attached to it, it was apparent that the knife had sharp serrated teeth. With the evidence before it, the jury could have reasonably concluded that Coleman's knife could inflict death and that Coleman "possessed, carried, or used" it as a weapon when he charged at Taylor.

{¶ 29} Coleman's conviction was not against the manifest weight of the evidence. Accordingly, his second assignment of error is overruled.

9

### III. Sentencing

{¶ 30} In his first assignment of error, Coleman claims that the trial court's sentence of 10 to 15 years in prison was not the minimum sanction to accomplish the purposes of felony sentencing and thus violated R.C. 2929.11. He emphasizes that he was 79 years old at sentencing, had kidney cancer, and was experiencing complications from his multiple gunshot wounds.

{¶ 31} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 9. Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2017-Ohio-4097, ¶ 6 (2d Dist.).

{¶ 32} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, ¶ 45 (2d Dist.). "It is enough that the record demonstrates that the trial court considered R.C. 2929.11 and R.C. 2929.12 prior to imposing its sentence." *State v. Trent*, 2021-Ohio-3698, ¶ 15 (2d Dist.). "A sentence is contrary to law when it does not fall within the statutory range for the offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12." *State v. Brown*, 2017-Ohio-8416, ¶ 74 (2d Dist.).

{¶ 33} R.C. 2929.11 requires trial courts to be guided by the overriding purposes of felony sentencing. Those purposes are threefold: "to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of

the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). "[A] sentencing court may place such weight on each of the purposes as the circumstances of the case require." *State v. Bittner*, 2019-Ohio-3834, ¶ 18 (12th Dist.). According to R.C. 2929.11(A), "the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both."

{¶ 34} R.C. 2929.12(B) sets forth ten factors indicating that an offender's conduct is more serious than conduct normally constituting the offense; R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense. R.C. 2929.12(D) and (E) each list five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. For each of these categories, the trial court may also consider "any other relevant factors." Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record, if any, and whether the offender has a condition traceable to that service that contributed to the commission of the offense.

{¶ 35} The Ohio Supreme Court has stated that R.C. 2953.08(G)(2)(b) "does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12." *State v. Jones*, 2020-Ohio-6729, ¶ 39. Accordingly, "[w]hen reviewing felony sentences that are imposed *solely* after considering the factors in R.C. 2929.11 and R.C. 2929.12, we do not analyze whether those sentences are unsupported by the record." (Emphasis added.) *State v. McDaniel*, 2021-Ohio-1519, ¶ 11 (2d Dist).

**{¶ 36}** In this case, Coleman does not assert that his sentence for felonious assault was outside the statutory range for a felony of the first degree. The trial court complied with its obligations under R.C. 2929.11 and 2929.12. Accordingly, we may not independently "weigh the evidence in the record and substitute [our] judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Jones* at ¶ 42.

**{¶ 37}** Coleman's first assignment of error is overruled.

### IV. Conclusion

**{¶ 38}** The trial court's judgment is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.

12